## Scott *v.* State.

(In Banc.    April 12, 1948.)

[34 So. (2d) 718.    No. 36699.]

**W. E. McIntyre,** of Brandon, and **John G. Burkett,** of Jackson, for appellant.

**Greek L. Rice,** Attorney General, by **Geo. H. Ethridge,** Assistant Attorney General, for appellee.

**L. A. Smith, Sr., J.,** delivered the opinion of the court.

The grand jury at Rankin County indicted appellant for the murder of L. C. Mattock, and the petit jury convicted him of manslaughter, for which crime the circuit judge sentenced him to the state penitentiary for a term of ten years.

Appellant was gambling with other Negroes in a "skin game," played with cards, when deceased and his companion, Harris, came upon the scene. Deceased, who was drunk, immediately started an unprovoked row with appellant, who, thereupon, left that game. He went to a nearby group, "shooting craps," where deceased followed

him and renewed his self-made quarrel with appellant for the second time, threatening to kill him. Finally, in his drunken anger, deceased left, stating he was going after his "gun," and kill the appellant, without intimating what kind of "gun" it was, whether pistol, rifle or shotgun.

On his way to the gambling site, deceased had left a shotgun at the home of Albert Jones, living between his own home and the gambling place. Appellant, a short time later, went to seek the intercession of the Jones Negro, and request Jones' aid in the prevention of his own death, threatened by the deceased. In this, he was corroborated by Harris. Appellant did not know that Mattock was going to Jones' house, or was therein, since Mattock's declaration caused him to understand that he was going to his home for his gun—not that he was going to Jones' house for it.

However, Mattock was in the home of Jones, having entered still in a drunken rage, after knocking down a harmless old Negro, for no cause at all, and shouting he was going to kill some sons of bitches. While Jones went into a room to get the shotgun of deceased, appellant entered, and immediately deceased cried blasphemously, there is the gray haired son of bitch I am going to kill, or words to that effect. Appellant, at the moment, had a pistol in his pocket, which he had also when deceased twice threatened to murder him at the games, but which he there made no effort to use. Accompanying his threat aforesaid on appellant's arrival, deceased reached his hand in his overalls, which appellant, in view of Mattock's previous hostility, aggression and threats, interpreted as an intention to draw a weapon in consummation of the threats. Both he and Harris, who had come to the Jones' house looking for his wife, so testified. Appellant thereupon pulled his own pistol out of his pocket and fired one shot into the face of deceased, under an eye, as deceased faced appellant. This shot was fatal. Jones and his wife testified that it was night, and the house was

not lighted, which was contradicted by Harris, and the physical fact that appellant could see well enough to shoot deceased in the face. Appellant fled, and was arrested and tried some months later.

The theory of the State was that appellant pursued deceased for the purpose of slaying him, which, however, was contradicted by appellant, and Harris, and in our judgment the account of the affair given by Harris and appellant is reasonable, and largely undisputed, except by some negative testimony of Jones and his wife, Anne, in which both stated that they did not hear Mattock's alleged exclamation at the house, when appellant entered the front door. But the old Negro, hereinbefore mentioned, heard the threats before appellant entered, having fled in the meantime. And Harris had heard the threats at the gambling site, and also deceased's menacing statement in the home of Jones. Jones could not see Mattock at the time of the shooting, since he was getting his shotgun for him. His wife could not see him from where she stood, so that neither knew what deceased was doing when he was shot, but she saw appellant fire. Harris saw both deceased and appellant at the exact moment of the slaying, and corroborated appellant in his version of the event. No weapon was found on or near the body of deceased when the sheriff arrived.

We are of the opinion that the verdict of the jury was against the great weight of the evidence. At the common law, to justify the slaying of another in self-defense, there must have been actual danger of loss of life or suffering great bodily harm. Dyson v. State, 26 Miss. 362, 4 Cush. 362, 1 Morr. St. Cas. 710. But now, the danger need not be actual, but only reasonably apparent and imminent. As we held in Evans v. State, 44 Miss. 762, the term "apparent danger," as applied in cases of homicide, means such overt demonstration, by conduct and acts, of a design to take life or do some great personal injury, as would make the killing reasonably apparently necessary to self-preservation or to escape great bodily harm. Section

2218(f), Code 1942, makes homicide justifiable "When committed in the lawful defense of one's own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished." The phrase "reasonable ground to apprehend," used in the statute, implies apparent danger. Dillon v. State, 196 Miss. 625, 18 So. (2d) 457.

It was not required of appellant to prove that he acted in justifiable self-defense, but only that he raise a reasonable doubt of his guilt of the charge against him, unjustifiable homicide. The law authorizes action on reasonable appearances, Scott v. State, 56 Miss. 287; and the danger may be either real or apparent, Blalock v. State, 79 Miss. 517, 31 So. 105; Ingram v. State, 62 Miss. 142; Godwin v. State, 73 Miss. 873, 19 So. 712.

The fact that no weapon was found upon or near the body of the deceased by the sheriff, during his investigation, is not conclusive of the guilt of appellant under all of the circumstances of the case at bar. In Bang v. State, 60 Miss. 571, we laid down the rule that, in order to establish that a homicide was committed in self-defense, it is not essential that the defendant show that deceased actually had a deadly weapon. It is sufficient in that respect if he show that the conduct of deceased was such as to induce a reasonable belief that he had one. We there said: "It would be a hard doctrine to hold that the assailant must have in his hands a deadly weapon to justify the assailed from acting for his defense, in this day of improved weapons, which may be drawn and used with fatal effect in a few seconds; and it would be unmerciful to deny to the accused the benefit of appearances as presented to him and honestly acted on."

The judgment of the trial court is reversed, and the case remanded for a new trial.

Reversed and remanded.